UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RVassets LTD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 23 C 14192 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| Marex Capital Markets Inc., David Hoffman, | ) | |
| and Jason Margiotta, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff RVassets LTD sued Defendants Marex Capital Markets Inc. ("Marex"),

formerly known as ED&F Capital Markets Inc., David Hoffman, and Jason Margiotta for

allegedly misappropriating trade secrets embedded in its options trading software, the RVa

Software, by reverse engineering certain proprietary functions.  RVassets alleges violations of

the Illinois Trade Secrets Act ("ITSA") (Count 1), 765 Ill. Comp. Stat. 1065/1 *et seq.*, the Defend

Trade Secrets Act ("DTSA") (Count 2), 18 U.S.C. § 1839 *et seq.*, tortious interference with

economic advantage (Count 3), the Illinois Deceptive Trade Practices Act ("IDTPA") (Count

4),[1] 815 Ill. Comp. Stat. 510/1 *et seq.*, unfair competition (Count 5), common law fraud (Count

6), fraudulent concealment (Count 7), and unjust enrichment (Count 8).  Defendants have moved

to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state

a claim.  The Court finds that RVassets states a claim under ITSA and DTSA, but because ITSA

preempts RVassets' tortious interference with economic advantage, unfair competition, fraud,

fraudulent concealment, and unjust enrichment claims, the Court dismisses these claims (Counts

---

[1] Although the complaint styles Count 4 as an IDTPA claim, it cites to the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et seq.*, as the basis for relief. Doc. 1 ¶ 210.  For completeness' sake, the Court considers RVassets' claim under both statutes.

3, 5–8) without prejudice. And while ITSA does not preempt RVassets' IDTPA or ICFA claim, RVassets' complaint fails to state an IDTPA or ICFA claim, and so the Court dismisses this claim (Count 4) without prejudice. RVassets may amend its complaint should it believe it can successfully replead any of the dismissed claims.

## BACKGROUND[2]

### I.    The Parties

RVassets is a London, England based corporation organized under United Kingdom law. It is a financial technology company that licenses access to proprietary algorithms that electronically price option contracts and execute trades on the Chicago Mercantile Exchange ("CME"). Thomas Fitch founded RVassets after working at banks such as Dresdner Bank, BNP Paribas, and JP Morgan over the course of two decades.

Marex is a New York corporation that regularly conducts business on the CME. It has a physical location in Chicago, Illinois. The company is a registered service provider with the CME and solicits business from institutional clients and investors to price and trade options on the CME. Prior to 2023, Marex was known as ED&F Capital Markets Inc., and it changed its name in connection with an acquisition.

David Hoffman is a New Jersey citizen. Jason Margiotta is a New York citizen. Hoffman and Margiotta worked at Marex to develop its options pricing and trading software, known as OptionsLive.

---

[2] The Court takes the facts in the background section from RVasset's complaint and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

II.     **Exchange-Traded Options and RVassets' Software**

Options are futures contracts that allow investors to bet on or hedge against the future price changes of an underlying asset, which can be a financial asset such as GameStop stock, or a physical commodity like grain or crude oil. The price an investor pays when purchasing (or receives when selling) an option, known as the "strike price," depends on several variables, including the current price of the underlying asset, the asset's volatility, and the risk-free rate of return. "Exchange-traded options" are futures contracts that investors buy and sell on regulated exchanges such as the CME. When an exchange like the CME lists an option for sale, the price is quoted as a spread between the price the seller wishes to obtain (known as the "bid price") and the price the buyer wishes to pay (the "ask price"). The minimum increments the exchange allows an option price to move, known as the "tick size," constrains traders in their ability to set bid and ask prices. Accordingly, the bid-ask spreads are typically one or two "ticks" wide.

Based on his extensive banking experience, Fitch realized that many of the options trades executed on electronic exchanges like the CME were inefficient because the optimal price of an option laid between ticks. Fitch discovered that he could analyze market data to determine a "synthetic price" for a given option, which improved upon the precision and width of the electronically listed bid-ask spread. *Id.* ¶ 40. However, traders could not obtain this price through a single trade because they could not ask or bid at fractions of a tick. To solve this problem, Fitch hypothesized that a trader could execute multiple sequential trades of complex option packages to "discover" the optimal synthetic price. *Id.* ¶ 41. Yet manually conducting these trades would lead to greater inefficiencies due to the speed necessary to execute Fitch's synthetic price strategy and the volatility of bid-ask spreads.

To circumvent the inefficiencies that the manual strategy would create and take advantage of the increased use of electronic options exchanges, Fitch developed a software that would allow traders to trade an option's synthetic price by placing a series of algorithmically devised, automatically executing trades. According to RVassets' complaint, "[t]his software is made up of a multitude of proprietary and confidential algorithms, data sets, processes, methods, compilations, programs, formulas, designs, techniques, and procedures that RVassets innovated, created, and developed to be capable of trading listed options" on various exchanges (the "RVa Software"). *Id.* ¶ 42. RVassets makes the RVa Software available through a user interface that gives customers access to its option pricing and automatic executing functionalities (the "RVa Platform"). At the time RVassets launched its product, the RVa Software was the only commercially available software that priced and executed these strategies for options.

Recognizing the RVa Software's unique function, RVassets worked to maintain its secrecy. Fitch was the only engineer who wrote the RVa Software source code and remains to date the sole person with unrestricted access to it. RVassets licenses access to the RVa Platform through licensing agreements that limit the permissible uses of the RVa Software. These limits include prohibitions against attempting to reverse engineer the RVa Software. Corporate entities who sign licensing agreements must ensure that the individual users under their control comply with the prohibitions set forth in the agreement. The RVa Software is only accessible through encrypted connections, which licensed users access via the RVa Platform using individual username and password credentials. RVassets provides these credentials in separate emails. Although the RVa Platform allows licensed users to place trades and view option prices through the interface, they are not able to access or readily ascertain "details of the functionality of the RVa Software, and the proprietary confidential algorithms, data sets, processes, methods,

compilations, programs, formulas, designs, techniques, and procedures embodied within the RVa Software." *Id.* ¶ 50.

### III. Marex Licenses the RVa Software and Launches OptionsLive

In 2016, Marex, under the name ED&F Man Capital Markets, started licensing the RVa Software. In doing so, Marex signed RVassets' licensing agreement, which included the prohibition against reverse engineering the RVa Software. Marex advertised its access to the RVa Platform in order to solicit business, with a particular focus on U.S. Treasury options available on the CME. This allowed Marex to attract business that it would have otherwise not been able to win, which in turn increased Marex's business volume, revenue, and profits.

Sometime between 2018 through 2019, Defendants decided to create OptionsLive, a competing platform and software package that performed similar functions as the RVa Software and Platform. To do this, they decided to misappropriate RVassets' trade secrets embedded in the RVa Software. Marex hired Hoffman and Margiotta in March 2019 to build the OptionsLive platform, but it did not share this fact with RVassets. Indeed, Marex duped RVassets into believing that Hoffman and Margiotta were simply members of the Marex brokerage team that worked to price options on behalf of Marex's clients. Based on this obfuscation, RVassets provided login credentials to Margiotta so he could access the RVa Platform and price and trade options using the RVa Software.

Despite having individual access to the RVa Platform, an RVassets employee, Adam Mann, who was visiting Marex's office, witnessed Margiotta sharing a desk and working in close proximity to Hoffman and two other Marex employees, Robert Lee and Dean Aldridge, who had their own login credentials. Marex, along with these employees, knew about the prohibition against reverse engineering the RVa Software contained in the licensing agreement. RVassets

alleges that Defendants abused their access to the RVa Platform in order to "probe [the RVa Software's] inner workings to glean information" embodied in the algorithms. *Id.* ¶ 85. By doing so, Defendants could test their prototype of OptionsLive against the outputs the RVa Platform provided. Indeed, Defendants "ran OptionsLive and the RVa Software in parallel to compare their respective outputs (e.g. the computed synthetic price) in order to, among other things, have OptionsLive more closely imitate the performance of the RVa Software, including the algorithms and other trade secrets embodied therein." *Id.* ¶ 89.

RVassets became suspicious of some of Lee's trading activity. At times during 2019, RVassets observed Lee executing economically insignificant trades or withdrawing trades that did not complete. Independent of potential reverse engineering risk, options exchanges could have viewed these trades as attempted market manipulation. When Fitch questioned Lee about these trades, Lee claimed that they were genuine trades that simply did not complete through the platform or that he was able to improve on through voice execution on the physical exchange trading floor. Concerns assuaged, RVassets did not revoke Lee's, Aldrich's, or the other Defendants' access to the RVa Platform and Software. Today, however, RVassets believes that Defendants used these trades to further hone OptionsLive's functionality.

On September 29, 2020, Marex publicly announced the launch of OptionsLive. They marketed it "as an algorithm-based software platform for electronically pricing and executing trades of listed options." *Id.* ¶ 111. They advertised its "proprietary algorithms and its ability to offer real-time fractional pricing (i.e. synthetic prices that are fractions of one tick) and execution." *Id.* ¶ 112. These are substantially similar functions as the RVa Software provides, and which RVassets claims Defendants built using its trade secrets. After the launch of OptionsLive, Marex boasted on its website that it had hired Margiotta and Hoffman to develop,

build, and market OptionsLive and co-lead its operations. By the end of 2020, Marex was no longer a RVassets client.

RVassets' business suffered after Defendants launched OptionsLive. One U.S.-based hedge fund, which frequently executed trades using the RVa Software, began using OptionsLive instead. And at least one of Marex's clients apparently did not know that Marex had switched from using the RVa Software to its own solution, continuing to believe "that their listed options trades through Marex continue to be priced and executed using the RVa Software." *Id.* ¶ 134.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615

(7th Cir. 2011) (citation omitted).  Rule 9(b) does not govern only claims of fraud; it applies to all allegations and averments of fraud.  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011); *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).  "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements."  *Borsellino*, 477 F.3d at 507.

## ANALYSIS

### I.  Group Pleading

Defendants argue that the Court should dismiss RVassets' complaint in its entirety because it impermissibly ties all "Defendants" together when certain allegations could only be brought against individual defendants.  *See* Doc. 25 at 18–20.  But "'group pleading' does not violate Fed. R. Civ. P. 8 so long as the complaint provides sufficient detail to put the defendants on notice of the claims."  *Lattimore v. Vill. of Streamwood*, No. 17 C 8683, 2018 WL 2183991, at *4 (N.D. Ill. May 11, 2018).  The Court's review of RVassets' complaint leads it to believe this is not a case where "the factual detail . . . [is] so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8."  *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007).  Indeed, Defendants' comprehensive brief, which forcefully argues against every stated ground for relief—with some success—indicates that they (collectively and individually) are fully aware of the nature of RVassets' allegations.  The Court sees no reason to hold RVassets to a higher bar than Rule 8 demands and denies Defendants' motion to dismiss its complaint on this ground.

## II.     ITSA and DTSA

ITSA and DTSA prohibit the misappropriation of trade secrets under Illinois and federal law, respectively.  Because the statutes are substantially similar, courts can analyze separate claims brought under these laws together.  *See PetroChoice LLC v. Amherdt*, No. 22 C 2347, 2023 WL 2139207, at *7 (N.D. Ill. Feb. 21, 2023).  A plaintiff bringing ITSA and DTSA claims must show "that the information at issue was a trade secret, that it was misappropriated and that it was used in the defendant's business."  *REXA, Inc. v. Chester*, 42 F.4th 652, 662 (7th Cir. 2022) (quoting *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003)); *see also Aon plc v. Infinite Equity, Inc.*, No. 19 C 7504, 2021 WL 4034068, at *12 (N.D. Ill. Sept. 3, 2021) (DTSA claim requires same elements).  Defendants argue that RVassets did not sufficiently allege the existence of a trade secret and that RVassets' misappropriation theory is implausible, warranting dismissal of the ITSA and DTSA claims.

### A.     Trade Secret

A trade secret consists of (1) business-related information, (2) that the owner has taken reasonable means to keep secret, and (3) that generates economic value through its secrecy.  *See* 18 U.S.C. § 1839(3).  Trade secret "allegations [are] adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms."  *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (collecting cases); *see Wells Lamont Indus. Grp. LLC v. Richard Mendoza & Radians, Inc.*, No. 17 C 1136, 2017 WL 3235682, at *3 (N.D. Ill. July 31, 2017) (allegation that the defendant "was exposed to confidential information such as customer account information, product summaries, pricing sheets, product prototypes, product designs, and detailed sales reports" sufficed at the pleading stage).  But the "general terms" pleading standard does not give plaintiffs license to allege the

existence of a trade secret in a conclusory manner: "It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992).

Defendants ridicule the substance of RVassets' trade secret allegations, arguing that the complaint recites "more than twenty categories of 'trade secrets.'" Doc. 25 at 16. They point to *Creative Writer Software, LLC v. Schechter*, where the court faulted the plaintiff for not clearly identifying the actual aspect of the program that it claimed was a trade secret. No. 23 C 2471, 2023 WL 6786796, at *3–4 (C.D. Cal. Sept. 6, 2023). Defendants argue that RVassets has similarly failed to enlighten them and the Court of what proprietary information RVassets is actually trying to keep out of the public domain.

However, RVassets' trade secret allegations are not as absurd as Defendants paint them, and the nature of the trade secret at issue is not as opaque as Defendants hope. The complaint explains that RVassets' founder, Fitch, designed the software to fill a hole in the options trading market, namely the difficulty of manually executing options trades at an option's optimal synthetic price that may lie between an exchange's pricing ticks. The software allows traders to employ Fitch's trading strategy using the software, which "is made up of a multitude of proprietary and confidential algorithms, data sets, processes, methods, compilations, programs, formulas, designs, techniques, and procedures," Doc. 1 ¶ 42, through a user interface that RVassets licenses to customers. Given the complexity of the trading problem the RVa Software solves, the Court does not find it absurd that it would incorporate all of these elements that RVassets alleges are secretive. Nor does the Court take issue with the high level at which RVassets has pleaded its purported trade secrets. Instead, the Court finds that RVassets has satisfied the competing requirements to both inform it and Defendants of what information

RVassets claims that Defendants misappropriated while not divulging the substance of that information in its pleadings. *See Wells Lamont Indus.*, 2017 WL 3235682, at *3 ("[A] plaintiff must identify the purported trade secrets, but it may do so generally to avoid publicly disclosing the information in its court filings."); *Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 771 (N.D. Ill. 2009) ("Though [plaintiff] does not disclose the precise details of its trade secrets in its complaint, it is not required to do so, as this would result in public disclosure of the alleged trade secret."). Unlike the deficient pleadings in *Schechter*, it is obvious to this Court that the RVa Software's unique options trading functionality is the ultimate trade secret that RVassets alleges Defendants misappropriated. Thus, the Court finds that RVassets has sufficiently pleaded the existence of information that could constitute trade secrets.

Sufficiently pleading the existence of this information only gets RVassets halfway to alleging the existence of a trade secret, however. The second requirement is that RVassets must plead that it took "affirmative measures to prevent others from using [the] information." *Jackson v. Hammer,* 274 Ill. App. 3d 59, 67 (1995). "Whether the measures taken by a trade secret owner are sufficient to satisfy [ITSA's and DTSA's] reasonableness standard ordinarily is a question of fact for the jury." *Learning Curve Toys*, 342 F.3d at 725.

Defendants argue that RVassets pleaded itself out of court by admitting that it licensed access to the RVa Platform, which in turn made the RVa Software's functionality "evident to all its customers" who used the program. Doc. 25 at 20. But the allegations in RVassets' complaint sufficiently suggest that it attempted to maintain the secrecy of its software's inputs and algorithms, and that it would have been "difficult, costly, or time-consuming" for Defendants to replicate it. Restatement (Third) of Unfair Competition § 39 cmt. f; *see also Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 541 (7th Cir. 2021) ("[A] company does not forfeit trade secret

protection by publicly displaying or selling a product unless the trade secret is readily ascertainable upon examination of the product." (citing Restatement (Third) of Unfair Competition § 39 cmt. f.)).  To start, RVassets alleges that Fitch was the sole engineer behind the RVa Software and continues to be the only person with access to the program's source code. RVassets protects access to the RVa Software with an encrypted connection, requires users to log in through encrypted channels, and logs and monitors all activity on the platform.  Indeed, in one instance of such monitoring, RVassets questioned Marex regarding a series of allegedly insignificant and dummy trades that RVassets now believes were meant to test the operation of the RVa Software.  Clients who did not expend considerable effort to abuse their access to the RVa Platform would not be able to observe the actual means by which the RVa Software operated—they could not probe the algorithms, see the data on which it relied, or observe any other functions than those provided through the RVa Platform interface.  RVassets also required clients to sign licensing agreements that restricted the permissible uses of the RVa Software. These restrictions included an express prohibition against reverse engineering the program and required signees to inform sub-users of the provisions and to ensure compliance with the agreement.  These allegations surpass the minimum allegations that RVassets must plead to show steps to ensure the secrecy of the proprietary trade information.  *See, e.g.*, *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 180 (7th Cir. 1991) (alleging physical and contractual precautions "to maintain the confidentiality of" secrets suffice to survive motion to dismiss); *Cmty. Hosp. Partners, LLC v. Marshfield Clinic Health Sys., Inc.*, No. 22 C 234, 2023 WL 2424788, at *4 (W.D. Wis. Mar. 9, 2023) (denying motion to dismiss when plaintiff alleged "use of nondisclosure agreements"); *Puroon, Inc. v. Midwest Photographic Res. Ctr., Inc.*, No. 16 C 7811, 2018 WL 5776334, at *6 (N.D. Ill. Nov. 2, 2018) (denying motion for summary judgment

when plaintiff provided access to trade secret only after defendant signed nondisclosure agreement).

Defendants premise their fallback argument on the grounds that the confidentiality provisions in its licensing agreements did not bind them, as RVassets entered into them with ED&F Man Capital Markets Limited, a non-party. Doc. 1 ¶ 50. They argue that this deficiency is fatal to RVassets' trade secret claims because the confidentiality provisions would not have protected the trade secrets built into the RVa Software once Defendants started using them, thus destroying any trade secret protection to which the law would have otherwise entitled them. Candidly, the Court views this argument with some degree of suspicion given RVassets' allegation that Marex was once ED&F Man Capital Markets Limited, and recently changed its name in the wake of an acquisition. *See id.* ¶ 2 & n.1. This aside, it would be premature to determine whether the licensing agreement bound (or did not bind) Defendants at this stage— this is a factual matter best suited for disposition at summary judgment or trial—and the confidentiality agreement is not the sole measure that RVassets took to maintain the shroud of secrecy over the RVa Software's functionality. *See Liion, LLC v. Vertiv Grp. Corp.*, No. 18 C 6133, 2019 WL 1281977, at *2 (N.D. Ill. Mar. 20, 2019) ("[W]hether Plaintiff took sufficient steps to protect its trade secrets, that is . . . a factual inquiry that is unfitting at the motion-to-dismiss stage."). Perhaps Defendants can show at summary judgment that the confidentiality provision never applied to them, and perhaps Defendants can show at that stage that this destroys RVassets' claims. But the Court cannot decide that without a more developed record before it, and it may not be the ultimate arbiter on this issue at all. *See Learning Curve Toys*, 342 F.3d at 725 ("Whether the measures taken by a trade secret owner are sufficient to satisfy [ITSA's and DTSA's] reasonableness standard ordinarily is a question of fact for the jury."). At this stage,

the Court finds that RVassets has sufficiently alleged that it took steps to maintain the confidentiality of its trade secret information.

Pairing RVassets' allegations with respect to its confidential information with the steps it took to maintain the information's secrecy, the Court finds that the complaint sufficiently alleges that the RVa Software is a trade secret (or at least had components that are trade secrets).

### B.     Misappropriation

ITSA defines misappropriation in part as the "acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means." 765 Ill. Comp. Stat. 1065/2(b)(1). Defendants argue that RVassets' complaint falls woefully short of stating a plausible act of misappropriation because the complaint rests on a series of "must have done it" assumptions linking Marex's use of the RVa Software to its future release of OptionsLive, rather than discrete acts of misappropriation. Doc. 25 at 15 (citing cases rejecting the *post hoc ergo propter hoc* logical fallacy).

Defendants' efforts to ward off a strawman of RVassets' allegations are unavailing. Even a cursory examination of the complaint shows multiple alleged acts of misappropriation that satisfy RVassets' burden at the motion to dismiss stage. According to the complaint, Marex hired Hoffman and Margiotta to build OptionsLive, and secured Margiotta's login credentials for the RVa Platform without informing RVassets of his role. Hoffman and Margiotta also viewed the operation of the RVa Platform by observing Lee's and Aldrich's use of the system. After building the OptionsLive platform, Defendants then used the RVa Software to check their solution's outputs. In doing so, Defendants gained insight into the functions of the pricing and execution algorithms—trade secrets embedded into the RVa Software—that allowed Defendants to successfully reverse engineer them. These allegations show that RVassets' complaint does not

14

sound only in alleged similarities between the RVa Software and OptionsLive, as Defendants

assert. *See Learning Curve Toys*, 342 F.3d at 730 ("[Plaintiff] had no legal authority to reverse

engineer the prototype that it received in confidence."); *ILG Indus., Inc. v. Scott*, 49 Ill. 2d 88, 94

(1971) (reverse engineering can constitute misappropriation "particularly where such a process is

relatively time-consuming and expensive as compared with the utilization of a drawing or

specification"). As such, the Court finds that RVassets' allegations suffice to plead

misappropriation.

Because RVassets sufficiently alleged the existence of a trade secret and acts of

misappropriation, the Court finds that RVassets' complaint states a claim for relief under both

ITSA and DTSA.

### III. Remaining State Law Claims

Defendants argue that ITSA's express preemption clause prevents RVassets from

bringing the state law claims contained in Counts 3–8 of its complaint, and that even if ITSA

does not preempt them that RVassets' complaint fails to state these claims. Section 8 of ITSA

states that, "[e]xcept as provided in subsection (b), [ITSA] is intended to displace conflicting

tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for

misappropriation of a trade secret." 765 Ill. Comp. Stat. 1065/8(a). "The ITSA preempts claims

for misappropriation of confidential information (whether a trade secret or not); it does not

preempt claims that do not hinge on whether the information at issue is confidential." *Westrock

Co. & Victory Packaging, LP v. Dillon*, No. 21 C 5388, 2021 WL 6064038, at *18 (N.D. Ill.

Dec. 22, 2021) (citing *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 405 (7th Cir. 2005)). In

deciding whether ITSA preempts a claim, the court asks whether it "would stand regardless of

whether trade secrets were at issue." *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 835 (N.D. Ill. 2019).

### A.    Tortious Interference With Economic Advantage (Count 3), Unfair Competition (Count 5), and Unjust Enrichment (Count 8)

"A plaintiff bringing a claim for tortious interference with a prospective economic advantage must allege: '(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.'" *Franklin Cash Reg., Inc. v. Dealzz*, No. 20 C 6258, 2022 WL 972292, at *3 (N.D. Ill. Mar. 31, 2022) (quoting *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015)).  An unfair competition claim requires allegations of the same elements.  *See Holbrook Mfg. LLC v. Rhyno Mfg. Inc.*, 497 F. Supp. 3d 319, 341 (N.D. Ill. 2020) ("In connection with a claim of unfair competition, Illinois courts require a plaintiff to plead and prove every element of a claim for tortious interference with prospective economic advantage.").  "In Illinois, '[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill. 2d 145, 160 (1989)).

Defendants argue that ITSA preempts RVassets' tortious interference claim because if they did not purportedly use the RVa Software to develop their own options trading solution then RVassets would merely be complaining that a client moved to a competing product, which does not a tortious interference claim make.  RVassets acknowledges that Defendants' "passing off

[of] OptionsLive as the RVa Software" forms the basis of its claim, but contends that it alleges additional acts "separate and apart from the misappropriation" that save this claim from ITSA preemption. Doc. 31 at 29. These actions include Defendants' alleged failure to inform "existing and potential customers that Defendants no longer have access to or the ability to use the RVa Software" while "insinuating to existing and potential customers that Defendants' pricing and execution platform had not changed." *Id.* (quoting Doc. 1 ¶¶ 132–33). Defendants and RVassets both point to their arguments with respect to this claim as grounds for finding that the unfair competition and unjust enrichment claims are—or are not—preempted.

RVassets argues that its claims are similar to those at issue in *Chemetall GMBH v. Zr Energy, Inc.*, No. 99 C 4334, 2000 WL 1808568 (N.D. Ill. Dec. 6, 2000). The court in *Chemetall* found that ITSA did not preempt the plaintiff's tortious interference claim where the complaint alleged that, in addition to the misappropriation of secret information, the defendant "represented that its . . . product was identical to that of [plaintiff] as to specifications and performance characteristics, and was manufactured using the same processes used by [plaintiff]." *Id.* at *4. Here, however, RVasset's complaint fails to allege the affirmative misrepresentations on which the *Chemetall* court appeared to rely when allowing the plaintiff's tortious interference claim to proceed. RVassets alleges that "Defendants failed to apprise their existing and potential customers that Defendants no longer have access to or the ability to use the RVa Software, while continuing to tout their access to and ability *to use an electronic pricing and execution trading tool for listed options*." Doc. 1 ¶ 132 (emphasis added). It then states that this "*likely caused confusion* by insinuating to existing and potential customers that Defendants' pricing and execution platform had not changed," *id.* ¶ 133 (emphasis added), and notes that at least one of Marex's customers believed that it was still using the RVa Platform. Without the

17

misappropriation of trade secrets lurking in the background, these allegations would not stand alone to state a claim for tortious interference with an economic advantage. As such, ITSA preempts this claim. *See Uptake Techs., Inc.*, 394 F. Supp. 3d at 835.

Because both RVassets and Defendants pointed to their arguments on this claim with respect to RVassets' unfair competition and unjust enrichment claims, the Court finds that those are preempted as well. However, the Court dismisses these claims without prejudice and will give RVassets the opportunity to amend its complaint should it believe that it can add factual allegations that will state a claim independent of the allegedly misappropriated trade secrets.

### B.    IDTPA or ICFA (Count 4)

ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the [IDTPA]." 810 Ill. Comp. Stat. 505/2. "The elements of a claim under the Illinois Consumer Fraud Act are: (1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 501 (1996). The IDTPA makes it unlawful for a person to "engage[] in a deceptive trade practice," including, *inter alia*, "pass[ing] off goods or services as those of another," "caus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services," and "caus[ing] likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another." 815 Ill. Comp. Stat. 510/2(a)(1)–(3).

18

Defendants argue that RVassets' IDTPA claim is a "passing off" claim that ITSA preempts. They argue that if Marex never allegedly incorporated aspects of the RVa Software into its own solution, then RVassets would not have a claim. RVassets argues that Defendants' alleged passing off "intentionally caused confusion" as to whether Marex used the RVa Software or a different solution in its options trading, which states an independent ground for relief separate from its misappropriation claim. Doc. 31 at 30.

The Court begins its analysis by noting that the case Defendants cite in their opening brief to argue preemption, *Seaga Manufacturing, Inc. v. Fortune Metal, Inc.*, is of no help because the plaintiff in that case did "not even attempt to salvage [its ICFA claim] from a preemption attack." No. 99 C 50332, 2001 WL 1196184, at *2 (N.D. Ill. Oct. 10, 2001). The court in *Seaga* thus granted preemption by default. Here, however, RVassets contests the preemption issue, pointing to *Chemetall*, which the Court discussed above, and *Organ Recovery Systems, Inc. v. Preservation Solutions, Inc.*, No. 11 C 4041, 2012 WL 116041 (N.D. Ill. Jan. 16, 2012), as analogous cases that counsel the Court to find that ITSA does not preempt its IDTPA or ICFA claim.

The Court agrees with RVassets, and finds that ITSA does not preempt their ITDPA or ICFA claim. Although Defendants are correct that if RVassets' claim merely boils down to allegations of "passing off," then the claim would not be fundamentally separate from RVassets' misappropriation claim, meaning ITSA would preempt it. But RVassets' contention that its IDTPA or ICFA claim is not preempted if Defendants "intentionally caused confusion" about aspects of their OptionsLive solution because that is a separate issue apart from Defendants' alleged misappropriation of RVassets' technology is correct, meaning that ITSA ultimately does not preempt this claim. Doc. 31 at 30; *see Organ Recovery Sys.*, 2012 WL 116041 at *6 (finding

19

that ITSA does not preempt ICFA claim when plaintiff alleged that "defendants disparaged its products and lied about their own").

This poses an issue for RVassets, however, because it does not actually allege actions that Defendants took that would lead to this confusion. RVassets points to paragraphs 129–42 of its complaint to support this market "confusion." At most, these paragraphs show that Marex had made prior statements to its clients at some point prior to its licensing of the RVa Software and Platform to win clients interested in the options trading solution. Then, after Defendants successfully reverse engineered the technology and launched OptionsLive, they "passed off" this new software "to existing and potential customers." Doc. 1 ¶ 131. How did they do this? The complaint does not say. And, notwithstanding the lone statement of a single hedge fund manager, *see id.* ¶ 134, RVassets' claim of market confusion in turn confuses this Court given its allegations that Marex quite publicly boasted of its new OptionsLive software, *see id.* ¶ 110–13. If RVassets is asking the Court to infer that Defendants made a false statement to its clients, or that their (presumably) sophisticated clients assumed that Defendants' trading software remained the same (and that this mattered to them), then RVassets is asking the Court to infer too much. *See Kubiak*, 810 F.3d at 480–81 (plaintiff is only entitled to reasonable inferences in their favor). Without alleging facts that show that Defendants committed a deceptive act, the Court cannot find that RVassets has stated a claim under IDTPA or ICFA. *See Connick*, 174 Ill. 2d at 501 (allegation of a deceptive act or practice is necessary to state a claim).

Thus, the Court finds that ITSA does not preempt RVassets' IDTPA or ICFA claim, but that it nevertheless fails to state a claim under Rule 12(b)(6). The Court therefore dismisses this claim without prejudice. If RVassets chooses to replead this claim, it would be wise to clarify whether it is attempting to assert an IDTPA claim, an ICFA claim, or both.

20

### C.      Fraud (Count 6) and Fraudulent Concealment (Count 7)

"In Illinois, fraud claims require a five-part showing: (1) a false statement or omission of a material fact; (2) the defendant's knowledge or belief that the statement was false; (3) the defendant's intent to induce the Plaintiff to act; (4) the plaintiff's reliance upon the truth of the statement; and (5) damages to the plaintiff resulting from his reliance on the statement." *McMahan v. Deutsche Bank AG*, 938 F. Supp. 2d 795, 803 (N.D. Ill. 2013) (citing *Connick*, 174 Ill. 2d at 496). "In addition to the basic elements of fraud, fraudulent concealment requires a plaintiff to 'allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff.'" *Id.* at 805 (quoting *Connick*, 174 Ill. 2d at 500).

Defendants argue that ITSA preempts RVassets' fraud and fraudulent concealment claims because without the alleged misappropriation of trade secrets, RVassets has no factual basis to claim that Marex's statements about how it used the RVa Platform were misleading. RVassets argues that Marex's obfuscation of the nature of Hoffman's and Margiotta's roles in developing OptionsLive, which induced RVassets to provide login credentials to Margiotta, and Defendants' falsehoods regarding certain suspicious trades they placed—but did not complete—on the RVa Platform, are both fraudulent acts independent of Defendants' purported misappropriation.

Defendants' strongest case in support of their preemption claim is *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 270 (N.D. Ill. 2020). In that case, on summary judgment, the court determined that ITSA preempted the plaintiff's fraud claim when the plaintiff alleged that "Defendants shared their login credentials with their consultant team in India and that they cheated Plaintiff out of licensing fees in the amount of $32,076." *Id.* ITSA preempted the fraud claim because "login credentials are confidential information to protect

trade secrets" so "any loss of licensing fees from the sharing of such information is still based on the misuse of confidential information." *Id.* Defendants ask the Court to draw a line between the purportedly fraudulent use of login credentials in *ExactLogix* with their allegedly fraudulent *obtainment* of login credentials for Margiotta to gain access to the RVa Platform.

Of course, Rvassets sees things differently. It argues that the procurement of login credentials is similar to the defendants' fraudulent obtainment of medical devices, which the court in *CardioNet, Inc. v. LifeWatch Corp.* determined was a fraudulent act that ITSA did not preempt. No. 07 C 6625, 2008 WL 567223, at *4 (N.D. Ill. Feb. 27, 2008). The *CardioNet* court stated in conclusory fashion that "the harm of fraudulently obtaining the kits is separate and independent from the harm of obtaining trade secrets." *Id.* RVassets asks the Court to similarly rule.

But the Court agrees with Defendants that ITSA preempts RVassets' fraud and fraudulent concealment claims because RVassets would not have suffered any damage from Defendants' allegedly fraudulent acts without their subsequent alleged misappropriation of trade secrets. *See Uptake Techs., Inc.*, 394 F. Supp. 3d at 835. This case is unlike *CardioNet* because if Defendants' efforts failed to duplicate the options trading ability the RVa Software provides, then RVassets would obviously have suffered no injury: the provision of login credentials—even if abused—and non-execution of options trades—even if they were dummies to observe the platform's functionality—do not create their own damages, unlike the medical kits at issue in *CardioNet*. Thus, the Court finds that the fraud and fraudulent concealment claims are only based on Defendants' alleged misappropriation of RVassets' trade secrets, meaning that ITSA preempts them. *See ExactLogix, Inc.*, 508 F. Supp. 3d at 270; *Uptake Techs., Inc.*, 394 F. Supp. 3d at 835. The Court therefore dismisses these claims without prejudice and gives RVassets

leave to amend its complaint should it believe that it can plead an independent factual basis for fraud and fraudulent concealment.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss [24]. The Court dismisses RVassets' tortious interference with economic advantage, IDTPA or ICFA, unfair competition, fraud, fraudulent concealment, and unjust enrichment claims without prejudice. The Court gives RVassets leave to amend its complaint by June 3, 2024, should it so desire.


Dated: May 2, 2024

_____
SARA L. ELLIS
United States District Judge