**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| RVASSETS LTD., | : |
|              Plaintiff, | : |
| | : |
|      v. | : |
| | : |
| MAREX CAPITAL MARKETS INC., DAVID | : |
| HOFFMAN AND JASON MARGIOTTA | : |
| | : |
|              Defendants. | : |
| | : |

Case No.: 1-23-cv-14192

Honorable Sara L. Ellis, U.S.D.J.

JURY TRIAL DEMANDED

**DEFENDANTS' ANSWER AND ADDITIONAL DEFENSES
TO PLAINTIFF'S ORIGINAL COMPLAINT**

Pursuant to the Federal Rules of Civil Procedure, Defendants Marex Capital Markets Inc., David Hoffman, and Jason Margiotta (collectively, the "Defendants") answer the Original Complaint (ECF No. 1) of Plaintiff RVassets Ltd. ("Plaintiff"), dated September 27, 2023 (the "Complaint"), and assert additional defenses.

**ANSWER**

For ease of reference, this Answer uses the headings from the Complaint. The use of such headings is not an admission by Defendants of the truth of any allegations contained in the headings, and any such allegations or characterizations are denied. Any and all allegations not expressly and specifically admitted in this Answer are also denied.

**THE PARTIES**

1.      Plaintiff RVassets Ltd. is a corporation existing under the laws of the United Kingdom, with a place of business at 11 Aldridge Road Villas, London, England W11 1BL.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 1 and therefore deny these allegations.

2.    Defendant Marex Capital Markets Inc. (formerly ED&F Man Capital Markets Inc.) ("Marex")[1] is a corporation organized and existing under the laws of New York with a place of business at One Financial Place, 440 S La Salle Street, Chicago, Illinois 60606. Marex may be served through its registered agent, United Agent Group Inc., 350 S Northwest Hwy Ste 300, Park Ridge, Illinois 60068.

**ANSWER**:  Marex admits the allegations in the first sentence of paragraph 2 and the first sentence of the footnote to paragraph 2, and that United Agent Group Inc. is a registered agent of Marex, and further states that proper service of process is a legal conclusion as to which no answer is required. Marex denies the remaining allegations in paragraph 2 and the footnote.  Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 2 and the footnote and therefore deny these allegations.

3.    Defendant David Hoffman ("Hoffman") is an individual residing in New Jersey and may be served with process there or wherever he may be found.

**ANSWER**:  Defendants admit that Hoffman is an individual residing in New Jersey.  The remaining allegations in paragraph 3 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny these allegations.

4.    Defendant Jason Margiotta ("Margiotta") is an individual residing in New York and may be served with process there or wherever he may be found.

**ANSWER**:  Defendants admit that Margiotta is an individual residing in New York.  The remaining allegations in paragraph 4 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny these allegations.

## JURISDICTION AND VENUE

5.    Subject matter jurisdiction is proper in this Court under 28 U.S.C. §§ 1331, 1332, and 1367.

**ANSWER**:  The allegations in paragraph 5 are legal conclusions as to which no answer is

---

[1]  ED&F Capital Markets Inc. changed its name to Marex Capital Markets Inc. on or about February 2023 in connection with a corporate acquisition.  Therefore, ED&F Man Capital Markets Inc. and Marex Capital Markets Inc. are two different names for a single legal entity.

required.

6.      Subject matter jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States and the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836, *et seq*.).

**ANSWER**:  The allegations in paragraph 6 are legal conclusions as to which no answer is required.

7.      Subject matter jurisdiction in this Court is proper under 28 U.S.C. § 1367(a) because all of the claims are a part of the same case or controversy under Article III of the United States Constitution.

**ANSWER**:  The allegations in paragraph 7 are legal conclusions as to which no answer is required.

8.      Subject matter jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332 because the matter in controversy in this action exceeds $75,000, exclusive of interest and costs, and is between citizens of a foreign state and different states.

**ANSWER**:  The allegations in paragraph 8 are legal conclusions as to which no answer is required.

9.      As described herein, this Court has specific personal jurisdiction over Marex because it conducts regular business in and has substantial contacts with the State of Illinois, including certain of the actions complained of herein.

**ANSWER**:  Defendants deny the allegation that Marex committed the "actions complained of" in the Complaint.  The remaining allegations in paragraph 9 are legal conclusions as to which no answer is required.

10.      As described herein, this Court has specific personal jurisdiction over Hoffman because he has substantial contacts with the State of Illinois, including certain of the actions complained of herein.

**ANSWER**:  Defendants deny the allegation that Hoffman committed the "actions complained of" in the Complaint.  The remaining allegations in paragraph 10 are legal conclusions as to which no answer is required.

11.      As described herein, this Court has specific personal jurisdiction over Margiotta

because he has substantial contacts with the State of Illinois, including certain of the actions complained of herein.

**ANSWER**: Defendants deny the allegation that Margiotta committed the "actions complained of" in the Complaint. The remaining allegations in paragraph 11 are legal conclusions as to which no answer is required.

12. As described herein, venue in this District is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the actions complained of herein occurred in this District.

**ANSWER**: Defendants deny the allegation that the "actions complained of" in the Complaint occurred anywhere, including in this District. The remaining allegations in paragraph 12 are legal conclusions as to which no answer is required.

13. Marex is registered to do business in Illinois and has designated an agent for service of process in Illinois.

**ANSWER**: Marex admits the allegations in paragraph 13. Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 and therefore deny these allegations.

14. Marex maintains an office and employees at One Financial Place, 440 S La Salle Street, Chicago, Illinois 60606.

**ANSWER**: Marex admits that it has an office at the listed address and denies the remaining allegations in paragraph 14. Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 and therefore deny these allegations.

15. Marex registered as a service provider with CME Group for inclusion in the CME Group's service provider directory to solicit business from institutional clients and investors for its financial services, including pricing and trade execution services relating to futures and options traded on the Chicago Mercantile Exchange ("CME").

**ANSWER**: Marex denies the allegations in paragraph 15. Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 15 and therefore deny these allegations.

16.     Marex is a member of the CME owing certain duties and obligations to the CME while enjoying the benefits of the CME in this District and in the State of Illinois.

**ANSWER**:  Marex and Margiotta admit that Marex is a member of the CME, which is located in this District and State.  The remaining allegations in paragraph 16 are legal conclusions as to which no answer is required. Hoffman lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 16 and therefore denies these allegations.

17.     Marex leases and/or utilizes a data center at 350 E. Cermak Rd. in Chicago, Illinois at least in part to facilitate its electronic access to the CME.  Marex leases and/or utilizes a data center in Aurora, Illinois at least in part to facilitate its electronic access to the CME.

**ANSWER**:  Marex admits the allegations in the first sentence of paragraph 17 and denies the remaining allegations.  Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 17 and therefore deny these allegations.

18.     Marex regularly markets and sells its financial services to customers located in Illinois, including Chicago-based hedge fund clients.

**ANSWER**:  Marex admits that it markets and provides services to customers located in Illinois, and that some clients include hedge funds based in Chicago.  Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 18 and therefore deny these allegations.

19.     Marex regularly transacts business on the CME, such as pricing and executing trades in interest rate options listed on the CME (e.g. U.S. treasury, Eurodollar and/or SOFR options) on behalf of its clients, including Chicago-based clients.

**ANSWER**:  Marex and Margiotta admit that Marex prices and executes trades in interest rate options listed on CME on behalf of its clients, and Marex admits that some of its clients are based in Chicago.  Margiotta lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 19 and therefore denies these allegations, and Hoffman lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 19 and therefore denies these allegations.

20. As described in more detail below, Marex is a former customer of RVassets that formerly used RVassets's software platform to price and execute trades of listed options. The vast majority of those trades were through the CME.

**ANSWER**: Defendants admit that Marex had in the past used RVassets's software platform to price and execute certain trades. Marex denies the remaining allegations in paragraph 20; Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 20 and therefore deny these allegations.

21. As described in more detail below, this case concerns Defendants' improper use of RVassets's software platform and other information provided by RVassets to create its own competing software platform called OptionsLive. Defendants' improper use of the RVassets platform included pricing and executing interest rate options on the CME, which resulted in electronic communications between the RVassets platform and the CME.

**ANSWER**: Defendants deny the allegations in paragraph 21.

22. OptionsLive at least initially targeted traders in the market for listed U.S. Treasury options, which are exclusively traded on the CME.

**ANSWER**: Defendants deny the allegations in paragraph 22.

23. When the RVassets software platform is used to either price or execute interest rate options on the CME, the RVassets software actively sends messages (such as Requests for Quotes) to and receives information from the CME via CME servers. Those CME servers are located in or near Chicago, Illinois.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23 and therefore deny these allegations.

24. David Hoffman and Jason Margiotta held themselves out as co-heads and creators of the OptionsLive platform and were responsible for the overall OptionsLive business within Marex.

**ANSWER**: Defendants deny the allegations in paragraph 24.

25. Hoffman and Margiotta approached Connamara Technologies ("Connamara"), a FinTech firm based in Chicago, to help them build the OptionsLive platform and connect it to the CME using the CME Direct API.

**ANSWER**: Defendants deny the allegations in paragraph 25.

26. Hoffman and Margiotta wanted OptionsLive to have direct access to the CME

market data for interest rate options.

**ANSWER**:  Defendants admit the allegations in paragraph 26.

27.     The massive amount of data flowing between the OptionsLive platform and the CME created challenges during the development of the software to enable it to handle the traffic spikes that occurred during the trading day.

**ANSWER**:  Defendants deny the allegations in paragraph 27.

28.     Defendants, either by themselves or through intermediaries, have committed acts that constitute misappropriation of RVassets's trade secrets in the State of Illinois, including the Northern District.

**ANSWER**:  Defendants deny the allegations in paragraph 28, which are legal conclusions

as to which no answer is required in any event.

29.     The OptionsLive platform, which includes and/or made use of trade secrets misappropriated from RVassets, was designed, developed, and/or built, at least in part, in the State of Illinois, and more specifically, this District.

**ANSWER**:  Defendants deny the allegations in paragraph 29, which are legal conclusions

as to which no answer is required in any event.

30.     Hoffman and Margiotta had frequent communications with employees and/or contractors of Connamara in the State of Illinois, and more specifically this District, while designing and developing the OptionsLive platform.

**ANSWER**:  Defendants deny the allegations in paragraph 30.

31.     Use of OptionsLive constitutes use of RVassets's trade secrets.  When OptionsLive is used to either price or execute interest rate options on the CME in the State of Illinois, OptionsLive actively sends messages to and receives information from the CME via CME servers in the State of Illinois.

**ANSWER**:  Defendants deny the allegations in the first sentence of paragraph 31, which

are legal conclusions as to which no answer is required in any event.  Defendants lack knowledge

or information sufficient to form a belief about the truth of the remaining allegations in paragraph

31 and therefore deny these allegations.

32.     Soon after the OptionsLive platform was launched, it was handling 5% of the options trading on the CME as a whole.  This made OptionsLive the largest commercial user of

the CME Direct API.

**ANSWER**:  Defendants deny the allegations in paragraph 32.

33.     Hoffman and Margiotta regularly traveled to and conducted business in the State of Illinois and this District related to the actions complained of herein.

**ANSWER**:  Defendants deny the allegations in paragraph 33.

34.     RVassets fully incorporates herein the entirety of the Background section set forth below.

**ANSWER**:  Defendants incorporate the entirety of their responses to the Background section as if fully set forth below.

## BACKGROUND

35.     RVassets is a financial technology company that specializes in the use of algorithms to electronically price and execute listed options, including U.S. Treasury, Eurodollar and SOFR options listed on the CME.  In general, listed options trade on a regulated exchange, like the CME, and are sometimes also referred to as exchange-traded options.

**ANSWER**:  Defendants admit the allegations in the second sentence of paragraph 35, and lack knowledge or information sufficient to form a belief about the truth of the remaining allegations alleged in paragraph 35 and therefore deny these allegations.

36.     RVassets was founded by Thomas Fitch, along with several others, in 2014.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 36 and therefore deny these allegations.

37.     Prior to founding RVassets, Fitch had over two decades of experience in commercial banking and trading working for household names including Dresdner Bank, BNP Paribas, and JP Morgan.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 37 and therefore deny these allegations.

38.     One of the many impacts of the 2008 financial crisis was to cause a shift away from off-balance sheet derivatives and toward those traded in cleared and listed environments via regulated exchanges.  In addition, trades on certain listed options markets were beginning to move away from voice execution in open-outcry pits and toward electronic execution.  Fitch noticed

these shifts and saw an opportunity.

**ANSWER**: Defendants deny the allegations in the first and second sentences of paragraph 38. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 38 and therefore deny these allegations.

39. While listed options offered more transparency and liquidity, they also presented some challenges for traders seeking to execute at the best price. For example, the price at which individual options can be electronically traded on the exchange is constrained based on the tick size. The tick size is the minimum increment the price of an option can move. Prices are quotes [sic] as a range between the bid price (the price to sell) and the ask price (the price to buy). Consequently, the price range of a given option on the exchange will often be one or even two ticks wide. This range (the difference between the bid price and the ask price) is referred to as the bid-ask spread and represents one of the primary transaction costs of trading.

**ANSWER**: Defendants admit that the difference between a bid price and an ask price is referred to as a bid-ask spread, and deny the remaining allegations in paragraph 39.

40. Fitch recognized that often the realistic best price on an option could be between two ticks and could have a much narrower or tighter bid-ask spread. He saw that, by analyzing current and historical market data (both for individual options as well as more complex packages of options that include those options), an implied "synthetic price" could be determined for a particular option, which is typically much better than the listed price, in terms of both precision and the width of the bid-ask spread. Because it is likely to be a fraction of a tick, this synthetic price cannot be directly traded on the exchange electronically.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 40 and therefore deny these allegations.

41. Because this synthetic price cannot be directly traded on the exchange, Fitch further recognized that executing trades as close as possible to that price would present additional challenges. It would likely be necessary to engage in multiple transactions one after the other to trade some of the more complex packages of options that were used to discover the synthetic price. The order and timing of those transactions, among other things, could impact how closely the net execution price captured the quoted synthetic price.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 41 and therefore deny these allegations, and deny the remaining allegations of paragraph 41.

42. Fitch realized that performing these kinds of option pricing and execution strategies

manually would lead to inefficiencies and worse overall outcomes, especially for markets with high volatility in prices. He began to develop software that would include the options pricing and execution algorithms he was developing. He also developed a user interface that allows for real-time pricing and execution of listed options using those algorithms. This software is made up of a multitude of proprietary and confidential algorithms, data sets, processes, methods, compilations, programs, formulas, designs, techniques, and procedures that RVassets innovated, created, and developed to be capable of trading listed options (including U.S. Treasury options, Eurodollar, and SOFR options) on the CME, along with a few other exchanges (collectively, the "RVa Software"). Fitch has spent thousands of hours writing and refining the software code over many years. All labor, monies, talent, ingenuity, creativity, and resources used to develop the RVa Software came from Fitch or other RVassets shareholders.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 42 and therefore deny these allegations.

43.     RVassets's business is built around the RVa Software that Fitch created.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 43 and therefore deny these allegations.

44.     At the time that the RVa Software was built, there were no other commercially available software tools employing algorithms for pricing and executing listed options.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of when RVa Software was built and therefore deny these allegations, and deny the remaining allegations in paragraph 44.

45.     Given the uniqueness of the RVa Software and its centrality to RVassets's business, RVassets maintained the inner workings of the RVa Software as a trade secret. Fitch worked alone in coding the RVa Software. Fitch is the only person with access to the source code for the RVa Software. Access to the source code is password protected.

**ANSWER**: The allegations in the first sentence of paragraph 45 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny these allegations. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 45 and therefore deny these allegations.

46.     One or more instances of the RVa Software run on one or more network-connected servers to create a platform for accessing the option pricing and/or execution functionality (the "RVa Platform"). Users who have permission to access the RVa Platform connect via a secure,

encrypted connection.  In order to use the RVa Software via the RVa Platform, a user must login using their credentials (username and password).  RVassets employs a practice of providing a user with their username and password via separate communications to minimize the risk of an unauthorized party gaining access to the RVa Platform.  Activity accessing and/or using the RVa Software and/or the RVa Platform is logged and monitored.  For example, user activity (such as pricing and execution of options) is logged and monitored, and connections between the RVa Platform and trading platforms are logged and monitored.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in paragraph 46 and therefore deny these allegations.

47.     RVassets employees are given access to the RVa Platform only if it is necessary for their job functions.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in paragraph 47 and therefore deny these allegations.

48.     In the early days of the company, RVassets served as a brokerage, utilizing the RVa Software internally to price and execute trades on behalf of its clients.  At this point, those outside the company were not able to access the RVa Platform or use the RVa Software directly.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in paragraph 48 and therefore deny these allegations.

49.     A few years later, RVassets stopped serving as a brokerage and instead began selling limited access to the RVa Platform and/or RVa Software to certain third parties.  Such access is provided according to a contract that governs users' use of the RVa Software and RVa Platform, and it also contains provisions to protect and maintain confidentiality.  Even within such third parties, an individual's access is controlled using the credentials and other mechanisms described above.  At the time that the RVassets began to offer such access, there were no other commercially available software tools employing algorithms for pricing and executing listed options.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in paragraph 49 and therefore deny these allegations.

50.     The details of the functionality of the RVa Software, and the proprietary confidential algorithms, data sets, processes, methods, compilations, programs, formulas, designs, techniques, and procedures embodied within the RVa Software are not readily available or ascertainable to any person outside of RVassets.

**ANSWER**:  The allegations in paragraph 50 are legal conclusions as to which no answer

is required; to the extent an answer is required, Defendants deny these allegations.

51.     And, in most circumstances the details of the functionality of the RVa Software, and the proprietary confidential algorithms, data sets, processes, methods, compilations, programs, formulas, designs, techniques, and procedures embodied within the RVa Software are not readily available or ascertainable even to persons within RVassets.

**ANSWER**:  The allegations in paragraph 51 are legal conclusions as to which no answer

is required; to the extent an answer is required, Defendants deny these allegations.

52.     Over time, a number of brokers and hedge funds saw the value of the RVa Software for trading listed options and became customers of RVassets, using the RVa Software via the RVa Platform under confidentiality and use restrictions.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in paragraph 52 and therefore deny these allegations.

53.     In late 2016, Marex (then ED&F Man Capital Markets) became a customer with access to the RVa Software via the RVa Platform.

**ANSWER**:  Defendants deny the allegations in paragraph 53.

54.     RVassets executed an initial agreement with a corporate affiliate of ED&F Man Capital Markets.

**ANSWER**:  Defendants admit that RVassets executed an agreement with ED&F Man

Capital Markets Limited, and deny the remaining allegations in paragraph 54.

55.     The agreement and/or renewals of the agreement remained in force during the entire period that ED&F Man Capital Markets was a customer with access to the RVa Software via the RVa Platform.

**ANSWER**:  The allegations in paragraph 55 are legal conclusions as to which no answer

is required; to the extent an answer is required, Defendants deny these allegations.

56.     The agreements limited the permissible uses of the RVa Software.

**ANSWER**:  The allegations in paragraph 56 purport to characterize certain contracts

between RVassets and ED&F Man Capital Markets Limited.  Defendants refer to the contracts for

their contents, the terms and conditions of which speak for themselves.  To the extent the

allegations in paragraph 56 are inconsistent with the terms and conditions of these contracts, Defendants deny them.  Defendants otherwise deny any remaining allegations in paragraph 56.

57.     In particular, the agreements between RVassets and ED&F Man Capital Markets prohibited ED&F Man Capital Markets from reverse engineering the RVa Software and the RVa Platform.

**ANSWER**:  The allegations in paragraph 57 purport to characterize certain contracts between RVassets and ED&F Man Capital Markets Limited.  Defendants refer to the contracts for their contents, the terms and conditions of which speak for themselves.  To the extent the allegations in paragraph 57 are inconsistent with the terms and conditions of these contracts, Defendants deny them.  Defendants otherwise deny any remaining allegations in paragraph 57.

58.     Likewise, using the RVa Software in any way that would likely be detrimental to RVassets or its business was prohibited.

**ANSWER**:  The allegations in paragraph 58 purport to characterize certain contracts between RVassets and ED&F Man Capital Markets Limited.  Defendants refer to the contracts for their contents, the terms and conditions of which speak for themselves.  To the extent the allegations in paragraph 58 are inconsistent with the terms and conditions of these contracts, Defendants deny them.  Defendants otherwise deny any remaining allegations in paragraph 58.

59.     The agreements also required ED&F Man Capital Markets to notify all of its RVa Software users about the use restrictions.

**ANSWER**:  The allegations in paragraph 59 purport to characterize certain contracts between RVassets and ED&F Man Capital Markets Limited.  Defendants refer to the contracts for their contents, the terms and conditions of which speak for themselves.  To the extent the allegations in paragraph 59 are inconsistent with the terms and conditions of these contracts, Defendants deny them.  Defendants otherwise deny any remaining allegations in paragraph 59.

60.     Certain individual brokers employed by Marex were issued personal access credentials from RVassets to allow them to access the RVa Platform and use the RVa Software to price and execute listed options on behalf of their clients, such as hedge funds.

**ANSWER**: Defendants admit that certain brokers employed by Marex were issued credentials by RVassets to access the RVa Platform and use the RVa Software, and deny the remaining allegations in paragraph 60.

61. Marex solicited business from its brokerage clients (such as hedge funds) by touting Marex's ability to access the RVa Platform and use the RVa Software to price and execute listed options, especially U.S. Treasury options on the CME.

**ANSWER**: Marex denies the allegations in paragraph 61. Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 61 and therefore deny these allegations.

62. For example, individual brokers at Marex who had been issued access credentials from RVassets would emphasize their ability to make use of the proprietary algorithms embodied in the RVa Software to clients and/or potential clients as giving them a competitive advantage over competing brokers.

**ANSWER**: Marex denies the allegations in paragraph 62. Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 62 and therefore deny these allegations.

63. The superior performance of the proprietary pricing and execution algorithms embodied in the RVa Software allowed Marex to obtain business from clients and prospective clients that it would not otherwise have obtained.

**ANSWER**: Marex denies the allegations in paragraph 63. Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 63 and therefore deny these allegations.

64. For example, a Marex broker's ability to quickly respond to client inquiries with a better price (i.e., the RVassets computed synthetic price with a smaller bid-ask spread) than its competitors who did not have access to the RVa Platform often allowed them to win the client's business and execute the quoted options trade on behalf of the client, especially when they were able to subsequently execute at or near the quoted price. These and other advantages were the direct result of Marex's use of the RVa Software.

**ANSWER**: Marex denies the allegations in paragraph 64. Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph

64 and therefore deny these allegations.

65.    Marex's use of the RVa Software increased the volume of business Marex was transacting on behalf of clients in listed options, particularly through electronic trading on the CME.

**ANSWER**:  Marex denies the allegations in paragraph 65.  Hoffman and Margiotta lack

knowledge or information sufficient to form a belief about the truth of the allegations in paragraph

65 and therefore deny these allegations.

66.    This correspondingly resulted in increased revenue and/or profits for Marex through, for example, commissions on executed transactions.

**ANSWER**:  Marex denies the allegations in paragraph 66.  Hoffman and Margiotta lack

knowledge or information sufficient to form a belief about the truth of the allegations in paragraph

66 and therefore deny these allegations.

67.    Marex became increasingly dependent on its access to the RVa Platform in order to maintain its business volume in listed options.

**ANSWER**:  Marex denies the allegations in paragraph 67.  Hoffman and Margiotta lack

knowledge or information sufficient to form a belief about the truth of the allegations in paragraph

67 and therefore deny these allegations.

68.    In the 2018-2019 timeframe, Defendants, individually, collectively, and/or at Marex's direction and control, decided to create a competing software platform that came to be known as OptionsLive.

**ANSWER**:  Defendants deny the allegations in paragraph 68.

69.    Defendants ultimately marketed OptionsLive based on its use of proprietary pricing and execution algorithms for electronically trading listed options on the CME, particularly U.S. Treasury options.

**ANSWER**:  Defendants deny the allegations in paragraph 69.

70.    At some point in the 2018-2019 timeframe, Defendants, individually, collectively, and/or at Marex's direction and control, decided to misappropriate RVassets's trade secrets to enable Defendants to develop the OptionsLive software and business.

**ANSWER**:  Defendants deny the allegations in paragraph 70.

71.     During this timeframe, there were no other commercially available software tools employing algorithms for pricing and executing listed options.

**ANSWER**:  Defendants deny the allegations in paragraph 71.

72.     Marex hired Hoffman and Margiotta in or around March 2019 for the express purpose of having them build and market the competing OptionsLive software and, ultimately, run the OptionsLive business within Marex.

**ANSWER**:  Defendants deny the allegations in paragraph 72.

73.      Hoffman and Margiotta held themselves out as co-heads and creators of the OptionsLive platform and were responsible for the overall OptionsLive business within Marex.

**ANSWER**:  Defendants deny the allegations in paragraph 73.

74.     Defendants decided to misuse their access to the RVa Software and RVa Platform (and to information regarding the RVa Software and RVa Platform) in designing, developing, building, and marketing OptionsLive.  Marex, including its senior executives, controlled, orchestrated, had knowledge of, directed, and approved this course of action.

**ANSWER**:  Defendants deny the allegations in paragraph 74.

75.     Defendants deliberately hid the fact that they were developing a competing product (OptionsLive) from RVassets.

**ANSWER**:  Defendants deny the allegations in paragraph 75.

76.     Defendants deliberately hid the nature of Hoffman and Margiotta's role from RVassets.

**ANSWER**:  Defendants deny the allegations in paragraph 76.

77.     Defendants led RVassets to believe that Hoffman and Margiotta were part of the Marex brokerage team who would price options trades on behalf of clients.

**ANSWER**:  Defendants deny the allegations in paragraph 77.

78.     On this basis of these misrepresentations and omissions, around May 2019, RVassets supplied Margiotta with login credentials to use the RVa Software (subject to the use restrictions described above) when he requested them.

**ANSWER**:  Defendants deny the allegations in paragraph 78.

79.     During a visit to Marex's office, RVassets employee Adam Mann observed that Margiotta shared a desk and worked closely with Hoffman, Robert Lee, and Dean Aldridge [sic]. Robert Lee and Dean Aldrige [sic] were brokers who had been given login credentials to use the RVa Software by RVassets.

**ANSWER**:  Defendants admit that RVassets gave a login credential to certain brokers and deny the remaining allegations of paragraph 79.

80.     Marex knew about the use restrictions pertaining to the RVa Software.

**ANSWER**:  The allegations in paragraph 80 purport to characterize certain contracts between RVassets and ED&F Man Capital Markets Limited.  Defendants refer to the contracts for their contents, the terms and conditions of which speak for themselves.  To the extent the allegations in paragraph 80 are inconsistent with the terms and conditions of these contracts, Defendants deny them.  Defendants otherwise deny any remaining allegations in paragraph 80.

81.     Hoffman knew about the use restrictions pertaining to the RVa Software.

**ANSWER**:  The allegations in paragraph 81 purport to characterize certain contracts between RVassets and ED&F Man Capital Markets Limited.  Defendants refer to the contracts for their contents, the terms and conditions of which speak for themselves.  To the extent the allegations in paragraph 81 are inconsistent with the terms and conditions of these contracts, Defendants deny them.  Defendants otherwise deny any remaining allegations in paragraph 81.

82.     Margiotta knew about the use restrictions pertaining to the RVa Software.

**ANSWER**:  The allegations in paragraph 82 purport to characterize certain contracts between RVassets and ED&F Man Capital Markets Limited.  Defendants refer to the contracts for their contents, the terms and conditions of which speak for themselves.  To the extent the allegations in paragraph 82 are inconsistent with the terms and conditions of these contracts, Defendants deny them.  Defendants otherwise deny any remaining allegations in paragraph 82.

83.     Lee and Aldrige [sic] knew about the use restrictions pertaining to the RVa Software.

**ANSWER**:  The allegations in paragraph 83 purport to characterize certain contracts between RVassets and ED&F Man Capital Markets Limited.  Defendants refer to the contracts for

their contents, the terms and conditions of which speak for themselves. To the extent the allegations in paragraph 83 are inconsistent with the terms and conditions of these contracts, Defendants deny them. Defendants otherwise deny any remaining allegations in paragraph 83.

84. Defendants directly and/or through Lee and Aldridge [sic] improperly used their access to the RVa Software and RVa Platform to acquire RVassets trade secrets.

**ANSWER**: Defendants deny the allegations in paragraph 84.

85. For example, rather than using the RVa Software to price and execute options on behalf of clients for legitimate business, Defendants improperly used the RVa Software in a manner designed to probe its inner workings to glean information embodied in the RVa Software that RVassets maintains as trade secrets, such as aspects of the pricing and execution algorithms.

**ANSWER**: Defendants deny the allegations in paragraph 85.

86. Defendants used these trade secrets in OptionsLive and/or to develop OptionsLive.

**ANSWER**: Defendants deny the allegations in paragraph 86.

87. Defendants disclosed these trade secrets to develop OptionsLive.

**ANSWER**: Defendants deny the allegations in paragraph 87.

88. Defendants disclosed these trade secrets to third parties, such as Connamara, during the development of OptionsLive.

**ANSWER**: Defendants deny the allegations in paragraph 88.

89. During the development of OptionsLive, Defendants ran OptionsLive and the RVa Software in parallel to compare their respective outputs (e.g. the computed synthetic price) in order to, among other things, have OptionsLive more closely imitate the performance of the RVa Software, including the algorithms and other trade secrets embodied therein.

**ANSWER**: Defendants deny the allegations in paragraph 89.

90. At certain times in mid-2019, RVassets, through routine monitoring of the RVa Software and RVa Platform, observed Lee executing a large number of economically insignificant trades and/or trades that did not complete. RVassets was aware that such behavior could potentially be viewed as market manipulation in violation of exchange rules.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of what RVassets purports to have observed or believed and therefore deny the allegations

in paragraph 90.

91.     Subsequently, Fitch reached out to Lee to seek an explanation for this activity.

**ANSWER**:  Marex denies the allegations in paragraph 91.  Hoffman and Margiotta lack

knowledge or information sufficient to form a belief about the truth of the allegations in paragraph

91 and therefore deny these allegations.

92.     In response, Lee assured Fitch that the trades in question were genuine client
business.

**ANSWER**:  Marex denies the allegations in paragraph 92 since they are based on

paragraph 91.  Hoffman and Margiotta lack knowledge or information sufficient to form a belief

about the truth of the allegations in paragraph 92 and therefore deny these allegations.

93.     Lee explained that, most of the time, if the trades didn't execute through the RVa
Software it was because the client pulled the order, or because he was able to get a better price by
executing via voice execution on the open-outcry trading floor.

**ANSWER**:  Marex denies the allegations in paragraph 93.  Hoffman and Margiotta lack

knowledge or information sufficient to form a belief about the truth of the allegations in paragraph

93 and therefore deny these allegations.

94.     Defendants convinced other colleagues who were aware of Fitch's inquiry to
provide a similar narrative for their activity in order to allay his concerns.

**ANSWER**:  Marex denies the allegations in paragraph 94.  Hoffman and Margiotta lack

knowledge or information sufficient to form a belief about the truth of the allegations in paragraph

94 and therefore deny these allegations.

95.     In reliance on the explanation from Lee and others, RVassets did not terminate
access to the RVa Software or RVa Platform for Defendants, Lee, or Aldrich.

**ANSWER**:  Marex denies the allegations in paragraph 95.  Hoffman and Margiotta lack

knowledge or information sufficient to form a belief about the truth of the allegations in paragraph

95 and therefore deny these allegations.

96.     At various times, brokers at Marex with permission to use the RVa Software would reach out to RVassets with questions and/or concerns about the functionality and operation of the RVa Software.

**ANSWER**:  Marex admits that some brokers at Marex discussed the RVa Software with RVassets, and denies the remaining allegations in paragraph 96.  Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 96 and therefore deny these allegations.

97.     RVassets sought to provide good customer service and to inspire confidence in the brokers who were using the RVa Software.  RVassets understood that, since there was no other commercially available software that performed these functions at the time, the brokers would understandably have some questions because its functionality and operation was new to them.  In response, RVassets would often share, in confidence, information regarding, for example, the RVa Software's pricing and execution of trades.

**ANSWER**:  Marex denies the allegations in paragraph 97.  Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 97 as to others and therefore deny these allegations, and deny the remaining allegations of paragraph 97.

98.     Defendants sought out such information from brokers who had received it and/or solicited brokers such as Robert Lee to request such information from RVassets under the guise of seeking customer service for client business.

**ANSWER**:  Defendants deny the allegations in paragraph 98.

99.     Defendants used such information in conjunction with their misuse of their access to the RVa Software and RVa Platform to aid in their efforts to probe its inner workings to learn and then take for themselves the trade secrets embodied in the RVa Software.

**ANSWER**:  Defendants deny the allegations in paragraph 99.

100.     The actions of Hoffman, Margiotta, Lee, and Aldrich were taken in the course and scope of their employment.

**ANSWER**:  The allegations in paragraph 100 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny these allegations.

101.     Marex is responsible for the actions of these employees.

**ANSWER**:  The allegations in paragraph 101 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny these allegations.

102.    Marex was aware of and encouraged the misappropriation of RVassets's trade secrets as evidenced by, at least, the hiring of Hoffman and Margiotta coupled with efforts to conceal their role and activities from RVassets.

**ANSWER**:  Defendants deny the allegations in paragraph 102.

103.    Hoffman, Margiotta, Lee, and Aldrich acted as agents of Marex in misappropriating RVassets's trade secrets and further engaging in the wrongdoing described herein.

**ANSWER**:  The allegations in paragraph 103 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny these allegations.

104.    Hoffman, Margiotta, Lee, and Aldrich acted under the direction and control of Marex in misappropriating RVassets's trade secrets and further engaging in the wrongdoing described herein.

**ANSWER**:  The allegations in paragraph 104 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny these allegations.

105.    Marex conditioned Hoffman, Margiotta, Lee, and Aldrich's participation in misappropriating RVassets's trade secrets and further engaging in the wrongdoing described herein and benefitted upon Hoffman, Margiotta, Lee, and Aldrich performing the steps necessary to engage in such actions, such as using RVassets's trade secrets to develop and release a competing product in late September 2020.

**ANSWER**:  Defendants deny the allegations in paragraph 105.

106.    Defendants engaged in a joint enterprise through an agreement, common purpose, community of pecuniary interest, or equal right to control to misappropriate RVassets's trade secrets and further engage in the wrongdoing described herein.

**ANSWER**:  The allegations in paragraph 106 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny these allegations.

107.    Marex, Hoffman, and Margiotta conspired with each other to engage in the wrongdoing described herein.

**ANSWER**:  The allegations in paragraph 107 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny these allegations.

108.     Marex, Hoffman, and Margiotta then actively engaged in the wrongdoing described herein in furtherance of their agreement.

**ANSWER**:  The allegations in paragraph 108 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny these allegations.

109.     Defendants all profited from knowing the actions of other Defendants as described herein and not stopping the tortious acts from occurring.

**ANSWER**:  Defendants deny the allegations in paragraph 109.

110.     Defendants first publicly announced the launch of OptionsLive on September 29, 2020.

**ANSWER**:  Marex and Hoffman admit that a press release about OptionsLive was issued on or about September 29, 2020, and deny the remaining allegations in paragraph 110.  Margiotta lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 110 and therefore denies these allegations.

111.     Defendants marketed OptionsLive as an algorithm-based software platform for electronically pricing and executing trades of listed options.

**ANSWER**:  Defendants admit that OptionsLive was marketed for many different features and functions, one of which was electronically pricing and executing trades of listed options. Defendants otherwise deny the allegations in paragraph 111.

112.     Defendants touted OptionsLive's proprietary algorithms and its ability to offer real-time fractional pricing (i.e. synthetic prices that are fractions of one tick) and execution.

**ANSWER**:  Defendants admit the allegations in paragraph 112.

113.     OptionsLive at least initially targeted traders in the market for listed U.S. Treasury options, which are exclusively traded on the CME.

**ANSWER**:  Defendants deny the allegations in paragraph 113.

114.     OptionsLive offers substantially similar functionality to the RVa Software.

**ANSWER**:  Defendants deny the allegations in paragraph 114.

115.     Defendants attempted to copy at least portions of the functionality of the RVa

Software in developing OptionsLive, including key competitive and proprietary features such as its real-time synthetic pricing and execution.

**ANSWER**: Defendants deny the allegations in paragraph 115.

116. OptionsLive includes and/or made use of trade secrets misappropriated from RVassets. Use of OptionsLive constitutes use of RVassets's trade secrets.

**ANSWER**: The allegations in paragraph 116 are legal conclusions as to which no answer

is required; to the extent an answer is required, Defendants deny these allegations.

117. Soon after the OptionsLive platform was launched, it was handling 5% of the options trading on the CME as a whole. This made OptionsLive the largest commercial user of the CME Direct API.

**ANSWER**: Defendants deny the allegations in paragraph 117.

118. Following the public launch of OptionsLive, Margiotta publicly announced that Defendants had traded "half a million contracts internally" using OptionsLive prior to its official release.

**ANSWER**: Defendants deny the allegations in paragraph 118.

119. At some point after the launch of OptionsLive, an official OptionsLive webpage was published that stated that Margiotta had joined Marex to develop OptionsLive and that Hoffman had joined Marex to build and market OptionsLive. It further identified Hoffman and Margiotta as the co-heads of the OptionsLive business.

**ANSWER**: Defendants admit the allegations in paragraph 119.

120. Around December 2020, Dean Aldrige [sic] participated in an on-line presentation about OptionsLive in which he revealed that he had played a role in helping to develop the platform.

**ANSWER**: Defendants deny the allegations in paragraph 120.

121. RVassets first became aware that Marex was developing and/or offering a competing product some time after the public launch of OptionsLive on September 29, 2020. RVassets first became aware that Hoffman and Margiotta had joined Marex to create and run OptionsLive some time after the public launch of OptionsLive on September 29, 2020. RVassets first became aware that Aldridge [sic] had been involved in helping to develop OptionsLive some time after December 2020.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about

what RVassets purports to have become aware of and when, and therefore deny the allegations in

paragraph 121.

122.    By around the end of 2020, Marex was no longer a customer of RVassets and its brokers therefore lost access to the RVa Software and the RVa Platform.

**ANSWER**:  Marex denies the allegations in paragraph 122.  Hoffman and Margiotta lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 122 and therefore deny these allegations.

123.    Defendants have unfairly competed and continue to unfairly compete with RVassets by operating and offering to their customers access to and/or use of the OptionsLive software that uses and/or was designed using misappropriated trade secrets of RVassets.

**ANSWER**:  Defendants state that these allegations pertain to a claim that the Court dismissed and therefore that no response is required; to the extent a response is required, Defendants deny the allegations in paragraph 123.

124.    But for their misappropriation of RVassets's trade secrets, Defendants could not have developed their OptionsLive software.

**ANSWER**:  Defendants deny the allegations in paragraph 124.

125.    But for their misappropriation of RVassets's trade secrets, Defendants' OptionsLive software would not function as well as it does with the benefit of RVassets's misappropriated trade secrets.

**ANSWER**:  Defendants deny the allegations in paragraph 125.

126.    But for their misappropriation of RVassets's trade secrets, Defendants' OptionsLive software would not be as successful as it has been with the benefit of RVassets's trade secrets.

**ANSWER**:  Defendants deny the allegations in paragraph 126.

127.    But for their misappropriation of RVassets's trade secrets, Defendants could not have developed OptionsLive software on the timeline that they were able to, having the benefit of RVassets's trade secrets.

**ANSWER**:  Defendants deny the allegations in paragraph 127.

128.    Defendants have been unjustly enriched through their misappropriation of RVassets's trade secrets.  For example, Defendants have earned incremental revenue and/or profits from operating and offering to their customers access to and/or use of the OptionsLive software in

the form of commissions on the trading of listed options via OptionsLive, among other things.

**ANSWER**:  Defendants state that these allegations pertain to a claim that the Court dismissed and therefore that no response is required; to the extent a response is required, Defendants deny the allegations in paragraph 128.

129.    Prior to publicly launching OptionsLive, to solicit business for current and prospective clients, Marex and its brokers touted their access to and ability to use an electronic pricing and execution trading tool for listed options using proprietary algorithms and/or Marex's relationship with RVassets.

**ANSWER**:  Defendants state that these allegations pertain to a claim that the Court dismissed and therefore that no response is required; to the extent a response is required, Defendants deny the allegations in paragraph 129.

130.    After the launch of OptionsLive, Defendants sought to and did cause confusion in the market about which software platform (OptionsLive vs. RVassets) was being used to price and execute listed options by Marex and its brokers and/or Defendants' business relationship with RVassets.

**ANSWER**:  Defendants state that these allegations pertain to a claim that the Court dismissed and therefore that no response is required; to the extent a response is required, Defendants deny the allegations in paragraph 130.

131.    Defendants passed off OptionsLive as the RVa Software platform to existing and potential customers.

**ANSWER**:  Defendants state that these allegations pertain to a claim that the Court dismissed and therefore that no response is required; to the extent a response is required, Defendants deny the allegations in paragraph 131.

132.    In some cases, Defendants failed to apprise their existing and potential customers that Defendants no longer have access to or the ability to use the RVa Software, while continuing to tout their access to and ability to use an electronic pricing and execution trading tool for listed options.

**ANSWER**:  Defendants state that these allegations pertain to a claim that the Court dismissed and therefore that no response is required; to the extent a response is required,

Defendants deny the allegations in paragraph 132.

133.    Such conduct likely caused confusion by insinuating to existing and potential customers that Defendants' pricing and execution platform had not changed.

**ANSWER**:  Defendants state that these allegations pertain to a claim that the Court dismissed and therefore that no response is required; to the extent a response is required, Defendants deny the allegations in paragraph 133.

134.    As recently as April 2023, a portfolio manager at a Chicago-based hedge fund who is a Marex client expressed their belief to RVassets that their listed options trades through Marex continue to be priced and executed using the RVa Software. Any such trades were priced and/or executed using OptionsLive.

**ANSWER**:  Defendants state that these allegations pertain to a claim that the Court dismissed and therefore that no response is required; to the extent a response is required, Defendants deny the allegations in paragraph 134.

135.    Defendants' actions caused RVassets to lose current and prospective clients and/or market share.

**ANSWER**:  Defendants deny the allegations in paragraph 135.

136.    For example, prior to Defendants' launch of OptionsLive, beginning in 2019, RVassets had an ongoing business relationship with a U.S.-based hedge fund customer who was paying for direct access to the RVa Software and RVa Platform to price and execute trades on listed options, including on the CME, without needing to go through a broker such as Marex.

**ANSWER**:  Defendants state that Plaintiff has not identified the purported hedge-fund client on which these allegations are based, and thus Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 136 and therefore deny these allegations.

137.    The hedge fund was also a brokerage client of Marex.  Defendants knew the hedge fund had an agreement in place with RVassets to allow it to access the RVa Software and RVa Platform.

**ANSWER**:  Defendants state that Plaintiff has not identified the purported hedge-fund client on which these allegations are based, and thus Defendants lack knowledge or information

sufficient to form a belief about the truth of the allegations in paragraph 137 and therefore deny these allegations.

138.    The hedge fund executed strong trade volumes through the RVa Software throughout 2019 and most of 2020.

**ANSWER**:  Defendants state that Plaintiff has not identified the purported hedge-fund client on which these allegations are based, and thus Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 138 and therefore deny these allegations.

139.    After September 2020 (and the public launch of OptionsLive), the hedge fund's trade volumes through the RVa Software abruptly decreased.

**ANSWER**:  Defendants state that Plaintiff has not identified the purported hedge-fund client on which these allegations are based, and thus Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 139 and therefore deny these allegations.

140.    To entice the hedge fund to cease its direct business relationship with RVassets and redirect its options trading business to Defendants, Defendants promoted OptionsLive (which was the product of Defendants' misappropriation of RVassets's trade secrets).

**ANSWER**:  Defendants state that Plaintiff has not identified the purported hedge-fund client on which these allegations are based, and thus Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 140 and therefore deny these allegations.

141.    Subsequently, the hedge fund terminated its contract with RVassets.

**ANSWER**:  Defendants state that Plaintiff has not identified the purported hedge-fund client on which these allegations are based, and thus Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 141 and therefore deny these allegations.

142.     In addition to lost customers, revenue, profits, and market share, RVassets has also suffered price erosion in order to compete with Defendants due to the introduction of OptionsLive into the market. On the other hand, Defendants have been unjustly enriched by their misappropriation of RVassets's trade secrets at RVassets's expense.

**ANSWER**:  Defendants state that these allegations pertain to a claim that the Court dismissed and therefore that no response is required; to the extent a response is required, Defendants deny the allegations in paragraph 142.

## COUNT 1

143.     RVassets incorporates the allegations of all of the foregoing and subsequent paragraphs as if fully restated herein.

**ANSWER**:  Defendants incorporate by reference their responses to all of the foregoing and subsequent paragraphs as if fully set forth herein.

144.     The detailed functionality, algorithms, data sets, formulas, patterns, compilations, programs, methods, techniques, and/or processes embodied in the RVa Software and used in the RVa Platform (the "Trade Secrets") are proprietary to RVassets in that they are not generally known nor readily ascertainable to anyone other than RVassets.

**ANSWER**:  The allegations in paragraph 144 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny these allegations.

145.     At all times, RVassets has taken significant steps to maintain the secrecy of its intellectual property, including the Trade Secrets, by limiting access to only certain individuals including customers subject to confidentiality terms and/or duties.

**ANSWER**:  Defendants deny the allegations in paragraph 145.

146.     Over the past decade, RVassets has expended significant money, labor, talent, ingenuity, creativity, resources, and time developing and maintaining the Trade Secrets.

**ANSWER**:  By using the defined term "Trade Secrets," the allegations in paragraph 146 incorporate the legal conclusions in paragraph 144 and no answer is required with respect to such legal conclusions; to the extent an answer is required, Defendants deny the allegations in paragraph 146.

147.     The Trade Secrets derive independent, actual, and/or potential value because the

information is not known outside of RVassets, is not available through public sources, and is proprietary in nature.

**ANSWER**: The allegations in paragraph 147 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny the allegations in paragraph 147.

148. The Trade Secrets are also valuable to RVassets's competitors, including Defendants, and others in the listed options trading field.

**ANSWER**: By using the defined term "Trade Secrets," the allegations in paragraph 148 incorporate the legal conclusions in paragraph 144 and no answer is required with respect to those legal conclusions; to the extent an answer is required, Defendants deny the allegations in paragraph 148.

149. The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by persons other than RVassets, and the Trade Secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

**ANSWER**: The allegations in paragraph 149 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny the allegations in paragraph 149.

150. The Trade Secrets are trade secrets within the meaning of the ITSA, 765 ILCS § 1065 *et. seq.* Namely, the Trade Secrets set forth herein consist of "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." *See* 765 ILCS 1065/2(d).

**ANSWER**: The allegations in paragraph 150 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny the allegations in paragraph 150.

151. The Trade Secrets are trade secrets owned by RVassets.

**ANSWER**: The allegations in paragraph 151 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 151 and therefore deny

these allegations.

152.     Defendants misappropriated the Trade Secrets because, without permission, Defendants wrongfully disclosed the Trade Secrets to third parties in the course of developing OptionsLive.

**ANSWER**:  Defendants deny the allegations in paragraph 152.

153.     Defendants misappropriated the Trade Secrets by releasing OptionsLive publicly.

**ANSWER**:  Defendants deny the allegations in paragraph 153.

154.     Defendants misappropriated, and continues to misappropriate, RVassets' Trade Secrets by disclosing the Trade Secrets after acquiring access, directly or indirectly, by improper means.

**ANSWER**:  Defendants deny the allegations in paragraph 154.

155.     Defendants misappropriated, and continues to misappropriate, the Trade Secrets by using the Trade Secrets after acquiring access, directly or indirectly, by improper means.

**ANSWER**:  Defendants deny the allegations in paragraph 155.

156.     Defendants misappropriated, and continues to misappropriate, the Trade Secrets by disclosing and/or using OptionsLive and the Trade Secrets knowing the same was acquired, directly or indirectly, by improper means.

**ANSWER**:  Defendants deny the allegations in paragraph 156.

157.     Defendants misappropriated, and continues to misappropriate, the Trade Secrets by disclosing and/or using OptionsLive and the Trade Secrets knowing that at the time of disclosure or use the trade secrets were derived from or through a party who acquired the Trade Secrets under circumstances requiring its secrecy to be maintained or its use limited.

**ANSWER**:  Defendants deny the allegations in paragraph 157.

158.     Defendants misappropriated the Trade Secrets by producing a new product that is substantially derived from the Trade Secrets.

**ANSWER**:  Defendants deny the allegations in paragraph 158.

159.     Defendants' misappropriation of the Trade Secrets has caused, directly and proximately, substantial harm to RVassets and continues to pose a significant threat to RVassets's ongoing business.

**ANSWER**:  Defendants deny the allegations in paragraph 159.

160.     RVassets has suffered and continues to suffer irreparable harm with no adequate

remedy at law to prevent Defendants' use and disclosure of its Trade Secret information or to prevent this harm.

**ANSWER**:  Defendants deny the allegations in paragraph 160.

161.    RVassets has suffered damages resulting from Defendants' misappropriation of its Trade Secrets.

**ANSWER**:  Defendants deny the allegations in paragraph 161.

162.    Defendants' acts and conduct were willful, malicious, and in reckless disregard of the adverse consequences to RVassets.

**ANSWER**:  Defendants deny the allegations in paragraph 162.

163.    Defendants' actions, as described herein, constitute violations of one or more provisions of the ITSA.

**ANSWER**:  Defendants deny the allegations in paragraph 163.

164.    Defendants engaged in a civil conspiracy by forming an agreement to engage in the conduct discussed herein and committing and acts in furtherance of that agreement.

**ANSWER**:  Defendants deny the allegations in paragraph 164.

165.    Defendants are jointly and/or severally liable for RVassets's damages incurred as a result of Defendants' violations of one or more provisions of the ITSA.

**ANSWER**:  Defendants deny the allegations in paragraph 165.

166.    Defendants acted collectively, are subject to respondent superior liability, and/or at the direction and control of Marex.

**ANSWER**:  Defendants deny the allegations in paragraph 166.

## **COUNT 2**

167.    RVassets incorporates the allegations of all of the foregoing and subsequent paragraphs as if fully restated herein.

**ANSWER**:  Defendants incorporate by reference their responses to all of the foregoing and subsequent paragraphs as if fully set forth herein.

168.    The RVa Software, including as used in the RVa Platform, includes and makes use of Trade Secrets that constitute financial, business, scientific, technical, economic, and/or engineering information made up of tangible and/or intangible patterns, plans, compilations, programs, formulas, designs, prototypes, methods, techniques, processes, procedures, programs,

and/or codes.

**ANSWER**:  The allegations in paragraph 168 are legal conclusions as to which no answer

is required; to the extent an answer is required, Defendants deny the allegations in paragraph 168.

169.    At all times, RVassets takes significant steps to maintain the secrecy of its intellectual property, including the Trade Secrets, by limiting access to only certain individuals including customers subject to confidentiality terms and/or duties.

**ANSWER**:  Defendants deny the allegations in paragraph 169.

170.    Over the past decade, RVassets has expended significant money, labor, resources, talent, ingenuity, creativity, and time developing and maintaining the Trade Secrets.

**ANSWER**:  By using the defined term "Trade Secrets," the allegations in paragraph 170

incorporate legal conclusions and no answer is required with respect to those legal conclusions; to

the extent an answer is required, Defendants deny the allegations in paragraph 170.

171.    The Trade Secrets derive independent, actual, and/or potential value because the information is not known outside of RVassets, is not available through public sources, and is proprietary in nature.

**ANSWER**:  The allegations in paragraph 171 are legal conclusions as to which no answer

is required; to the extent an answer is required, Defendants deny the allegations in paragraph 171.

172.    The Trade Secrets are also valuable to RVassets's competitors, including Defendants, and others in the options trading field.

**ANSWER**:  By using the defined term "Trade Secrets," the allegations in paragraph 172

incorporate  legal conclusions and no answer is required with respect to those legal conclusions;

to the extent an answer is required, Defendants deny the allegations in paragraph 172.

173.    The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by persons other than RVassets, and the Trade Secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

**ANSWER**:  The allegations in paragraph 173 are legal conclusions as to which no answer

is required; to the extent an answer is required, Defendants deny the allegations in paragraph 173.

174.    RVassets owns the Trade Secrets.

**ANSWER**:  The allegations in paragraph 174 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 174 and therefore deny these allegations.

175.    The Trade Secrets are trade secrets within the meaning of the DTSA, 18 U.S.C. § 1839 *et. seq.*

**ANSWER**:  The allegations in paragraph 175 are legal conclusions as to which no answer is required; to the extent an answer is required, Defendants deny the allegations in paragraph 175.

176.    Defendants misappropriated the Trade Secrets because, at the time(s) Defendants used and disclosed the Trade Secrets, Defendants knew or should have known that the Trade Secrets were acquired by improper means.

**ANSWER**:  Defendants deny the allegations in paragraph 176.

177.    Defendants misappropriated the Trade Secrets by acquiring the Trade Secrets by improper means or by acquiring the Trade Secrets from a party known or who should have been known to Defendants to have acquired the Trade Secrets by improper means.

**ANSWER**:  Defendants deny the allegations in paragraph 177.

178.    Defendants misappropriated, and continues to misappropriate, the Trade Secrets by disclosing Trade Secrets after acquiring access, directly or indirectly, by improper means.

**ANSWER**:  Defendants deny the allegations in paragraph 178.

179.    Defendants misappropriated, and continues to misappropriate, the Trade Secrets by using the Trade Secrets after acquiring access, directly or indirectly, by improper means.

**ANSWER**:  Defendants deny the allegations in paragraph 179.

180.    Defendants misappropriated, and continues to misappropriate, RVassets's Trade Secrets by disclosing and/or using the Trade Secrets knowing and/or should have known it was acquired, directly or indirectly, by improper means.

**ANSWER**:  Defendants deny the allegations in paragraph 180.

181.    Defendants misappropriated, and continues to misappropriate, the Trade Secrets by disclosing and/or using the Trade Secrets knowing and/or having reason to know that at the time

of disclosure or use the Trade Secrets were derived from or through a party who acquired the Trade Secrets under circumstances requiring its secrecy to be maintained or its use limited.

**ANSWER**:  Defendants deny the allegations in paragraph 181.

182.    Defendants' misappropriation of the Trade Secrets has caused, directly and proximately, substantial harm to RVassets and continues to pose a significant threat to RVassets's ongoing business.

**ANSWER**:  Defendants deny the allegations in paragraph 182.

183.    RVassets has suffered and continues to suffer irreparable harm with no adequate remedy at law to prevent Defendants' use and disclosure of its trade secret information or to prevent this harm.

**ANSWER**:  Defendants deny the allegations in paragraph 183.

184.    RVassets has suffered damages resulting from Defendants' misappropriation of its Trade Secrets.

**ANSWER**:  Defendants deny the allegations in paragraph 184.

185.    Defendants' acts and conduct were willful, malicious, and in reckless disregard of the adverse consequences to RVassets.

**ANSWER**:  Defendants deny the allegations in paragraph 185.

186.    Defendants' actions, as described herein, constitute violations of one or more provisions of the DTSA.

**ANSWER**:  Defendants deny the allegations in paragraph 186.

187.    Defendants engaged in a civil conspiracy by forming an agreement to engage in the conduct discussed herein and committing and acts in furtherance of that agreement.

**ANSWER**:  Defendants deny the allegations in paragraph 187.

188.    Defendants are jointly and/or severally liable for RVassets's damages incurred as a result of Defendants' violations of one or more provisions of the DTSA.

**ANSWER**:  Defendants deny the allegations in paragraph 188.

189.    Defendants acted collectively, are subject to respondent superior liability, and/or at the direction and control of the Marex Defendants.

**ANSWER**:  Defendants deny the allegations in paragraph 189.

### COUNTS 3–8

**ANSWER**: Defendants state that Counts 3 through 8 (paragraphs 190–256) were dismissed by the Court on May 2, 2024 [ECF 35 at 1–2] and therefore no response is required; to the extent a response is required, Defendants deny these allegations.

### PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Defendants Marex Capital Markets Inc., David Hoffman, and Jason Margiotta respectfully request that the Court deny Plaintiff's claims and enter judgment in their favor and against Plaintiff, and for any other relief the Court deems just and equitable, including an award for attorneys' fees because Plaintiff's action was brought in bad faith. 18 U.S.C. § 1836(b)(3)(D); 765 ILCS 1065/5.

### JURY TRIAL DEMAND

Defendants demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b).

### ADDITIONAL DEFENSES

Defendants Marex Capital Markets Inc., David Hoffman, and Jason Margiotta, for their additional defenses to Plaintiff's Complaint, state as follows:

### FIRST ADDITIONAL DEFENSE

The Complaint fails to state a cause of action upon which relief may be granted. The Complaint's theory of misappropriation is implausible, including because Defendants never had access to the inner workings of the RVa Software.

### SECOND ADDITIONAL DEFENSE

Plaintiff does not own a trade secret or the information that Plaintiff claims was misappropriated does not constitute a trade secret.

### THIRD ADDITIONAL DEFENSE

Defendants did not receive or use any trade secrets of Plaintiff.

## FOURTH ADDITIONAL DEFENSE

Plaintiff did not maintain the secrecy of any alleged trade secrets.

## FIFTH ADDITIONAL DEFENSE

Development of OptionsLive is proper under the DTSA and ITSA. *See, e.g.,* 18 U.S.C. § 1839(6)(B); 765 ILCS 1065/2(a).

## SIXTH ADDITIONAL DEFENSE

The terms of the licensing agreements under which Plaintiff provided access to its software platform limit any potential recovery. Additionally, to the extent any of Plaintiff's claims are premised on the licensing agreements, the claims are governed by English law and the courts of England have exclusive jurisdiction over the claims.

## SEVENTH ADDITIONAL DEFENSE

Plaintiff's claims of misappropriation are made in bad faith, including because Plaintiff knows it did not give Defendants access to the purported trade secret(s) comprising the RVa Software. Plaintiff's claims are frivolous, legally unreasonable, and without factual foundation and evidentiary support. RVassets' lawsuit was brought with improper purposes or without conducting a reasonable and competent inquiry into the facts (many of which RVassets already possesses) underlying Marex's relationship with RVassets and Marex's use of RVassets' software.

## EIGHTH ADDITIONAL DEFENSE

Plaintiff's claims are barred by the doctrine of unclean hands. RVassets acted in bad faith, including by disabling the RVa Software during the course of the parties' relationship.

## NINTH ADDITIONAL DEFENSE

Plaintiff's claims are barred by the doctrine of laches, including on the basis that RVassets waited three years to bring this litigation and failed to proceed diligently, and Defendants have

been prejudiced thereby, including in its use of OptionsLive.

## TENTH ADDITIONAL DEFENSE

Plaintiff has failed to mitigate any damages.

## <u>RESERVATION OF RIGHTS</u>

Defendants reserve all defenses set forth in Federal Rule of Civil Procedure 8(c) and any other defenses, affirmative or otherwise, as they may prove through discovery. Defendants reserve the right to assert such claims, counterclaims, third-party claims, or other claims as investigation and discovery may prove applicable, and reserve all of their rights associated with any such claim or potential claim. Defendants further reserve the right to amend their Answer and Additional Defenses if investigation, discovery, and further information warrants such amendment, and further, to assert any applicable matters of law during the pendency of this action.

Dated: May 24, 2024      Respectfully submitted,


*/s/ Stacie R. Hartman*
Stacie R. Hartman (IL Bar No. 6237265)
John J. Byron (IL Bar No. 6334732)
Daniel Gelwicks (IL Bar No. 6320663)
Alexander S. Lewis (IL Bar No. 6344752)
STEPTOE LLP
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1258
Fax: (312) 577-1370
shartman@steptoe.com
jbyron@steptoe.com
dgelwicks@steptoe.com
allewis@steptoe.com

***Attorneys For Defendants***

**CERTIFICATE OF SERVICE**

I hereby certify that on this  24th day of May 2024, I caused the foregoing to be filed via the Court's CM/ECF system, which automatically serves a copy on all counsel of record.

*/s/ Stacie R. Hartman*
Stacie R. Hartman (IL Bar No. 6237265)